UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NORTHWEST HOME DESIGNING, INC.,

                        Plaintiff,

v.

BENJAMIN RYAN COMMUNITIES, LLC, and JOHN RYAN BAYS,

                        Defendants.

CASE NO. C14-5808BHS

ORDER GRANTING IN PART AND DENYING WITHOUT PREJUDICE IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

        This matter comes before the Court on Defendants Benjamin Ryan Communities, LLC ("BRC") and John Ryan Bays's ("Bays") (collectively "Defendants") motion for summary judgment (Dkt. 44).  The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part without prejudice the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

        On October 10, 2014, Plaintiff Northwest Home Designing, Inc. ("Northwest") filed a complaint against Defendants, Ramora Builders, LLC ("Ramora"), and James Bays alleging copyright infringement of numerous architectural works.  Dkt. 1

1   On November 7, 2014, Northwest filed an amended complaint against the same

2   defendants adding allegations that they also infringed the copyrights by including the

3   works in advertisements.  Dkt. 14.

4   On January 21, 2016, Defendants filed a motion for summary judgment.  Dkt. 44.

5   On February 22, 2016, Northwest responded.  Dkt. 60.  On March 4, 2016, Defendants

6   replied.  Dkt. 71.

7   As the motion was pending and trial drew near, the parties and the retained

8   mediator informed the Court that settlement was likely.  Although Northwest's claims

9   against Ramora and John Bays were dismissed with prejudice, Dkt. 87, the matter was

10  not settled.  The Court struck the pretrial conference and the trial date.  Dkt. 88.

11  On May 12, 2016, Defendants' attorney moved to withdraw from representation

12  asserting that Defendants have failed "to pay for legal services rendered in this case."

13  Dkts. 89, 90.  On May 31, 2016, the Court granted the motion and renoted the pending

14  motion so that the remaining corporate defendant could obtain counsel.  Dkts. 92–94.  On

15  July 5, 2016, attorney Dan Bridges appeared on behalf of Defendants.  Dkt. 97.

16  The motion is now ripe for consideration.

17  ## II. FACTUAL BACKGROUND

18  Northwest is a family-owned residential design firm founded in 1963 that creates

19  and sells stock home plans and custom home plans.  Dkt. 64, Declaration of April Lord-

20  Wittig ("Lord-Wittig Decl."), ¶ 3.  Since its founding, Northwest asserts that it has

21  created over 6,000 unique home design plans.  *Id*. at ¶ 4.

22

1         Bays began his career in commercial real estate fifteen years ago in the Puget

2   Sound area.  Dkt. 45, Declaration of John Bays ("Bays Decl."), ¶ 3.  Bays's work

3   inspired him to start his home-building company Builders of America, LLC, which was

4   renamed BRC in 2012.  *Id*. at ¶ 4–5.

5         Around 2005, Bays approached Northwest regarding licensing Northwest's plans

6   for homes in developments on which he was working.  Dkt. 63, Declaration of Robert

7   Mickey, ¶ 18.  Over the course of the next few years, Bays regularly met with Mr.

8   Mickey, Northwest's principal designer.  *Id*. at ¶¶ 18-24.  Bays and Mr. Mickey

9   frequently spent hours at a time together.  Mickey Decl., ¶ 19.  During these visits, Bays

10  picked Mr. Mickey's brain about the practical aspects regarding design and construction,

11  including which designs sold the best and why some plans were better sellers than others.

12  Mickey Decl., ¶ 19.  Mr. Bays valued the fact that Mr. Mickey was very hands on and

13  provided practical advice regarding how to design within the various jurisdictions and on

14  different types of lots.  Mickey Decl., ¶ 20.  Prior to the end of the relationship, Bays

15  estimates that 80% of BRC's homes were constructed using Northwest house plans.  Dkt.

16  55, Declaration of Samuel Bull ("Bull Dec."), Exh. C at 65:7–9.

17        Northwest asserts that BRC "had direct access to the [Northwest] plans at issue in

18  this lawsuit ("Infringed Plans")."  Dkt. 60 at 9.  Over almost a seven-year period, Bays

19  and other BRC employees, including without limitation, Ron Turner, James Kerby, Dana

20  Labrie, Ashlinda Pollard and Jennifer Lang, would visit Northwest's office.  Lord-Wittig

21  Decl., ¶ 6.  During these visits, they had access to numerous Northwest documents,

22  including without limitation, design conceptual preliminaries, marketing flyers, home

1  plan books, binders, brochures, architectural bid sets, and construction documents.  *Id*. at;

2  *see also* Bull Decl., Exh. B at 146:22–147:15.  Bays also met with Northwest's plan sales

3  team and consulted with Northwest's design professionals regarding plan modifications

4  on many of Northwest's plans and custom home designs.  Lord-Wittig Decl., ¶ 7.  Bays

5  and BRC employees also had access to Northwest's website, and received home plan

6  catalogs and several e-mails containing home plan marketing and brochures.  *Id*. at ¶ 8.

7      In addition to the repeat visits and access to the majority, if not all, of Northwest's

8  plans, BRC received copies of each of the Infringed Plans, or close derivatives of the

9  Infringed Plans.  *Id*. at ¶ 9.  These plans were purchased and received by BRC, after

10  paying for a single license fee, emailed, or hand-delivered to BRC for its review when it

11  was considering purchasing a plan.  *Id*. at ¶¶ 10–28.  Northwest asserts that, "[a]s a result,

12  [BRC] had access to full sets of construction documents for most, if not all, of the plans

13  at issue."  Dkt. 60 at 10 (citing Lord-Wittig Decl., ¶¶ 10–28).

14      In 2011, BRC started experimenting with designing its own original house plans.

15  Bays Decl., ¶ 13.  Over time, BRC developed a design process for creating original house

16  plans based on Bays's personal knowledge and experience as a production home builder.

17  *Id.* at ¶¶ 16–18.  In May 2013, BRC hired designer Ricky Sutherlin to prepare original

18  housing plans as part of BRC's in-house design team.  *Id*. at ¶ 20.  Mr. Sutherlin

19  previously worked for Northwest.  *Id*. at ¶ 21.

20      In October 2011, Bays consulted with Northwest staff regarding possible

21  modifications to Northwest's plan number 2502 for a project located at 8519 E.

22  McKinley, Tacoma, Washington ("McKinley Site").  Lord-Wittig Decl., ¶ 29.  During the

1   meeting, Bays sketched his requested changes on a marketing set for plan number 2502.

2   Lord-Wittig Decl., ¶ 29.  After the consultation, Ms. Lord-Wittig prepared an estimate, E-

3   61985, for Bays' requested changes, license fees, site plans, and blueprinting.  *Id*.

4   Sometime thereafter, Ms. Lord-Wittig followed up on the McKinley Site and was

5   informed that Bays was not ready to proceed.  *Id*.

6          On or about February 22, 2012, Northwest received an order for the McKinley

7   Site.  Lord-Wittig Decl., ¶ 30.  The order was for two stock plans, not the modification

8   custom project estimate, E-61985, that Northwest had previously prepared for Bays.  *Id*.

9   After conferring with an engineering company that Northwest and BRC used to approve

10  plans, Ms. Lord-Wittig discovered that BRC already had project plans for the McKinley

11  site.  *Id*. at ¶ 31.  After reviewing BRC's home plan, Ms. Lord-Wittig concluded that the

12  plan, number 2353, was nearly identical to the plan prepared by Northwest, number 2502.

13  *Id*. at ¶ 32.  Northwest attempted to resolve the issues, but resolution was futile.  *Id*. at ¶¶

14  34–35.  This action for copyright infringement followed.

15                        **III. DISCUSSION**

16         Defendants move for summary judgment on all of Northwest's claims of

17  infringement because the allegedly infringing plans are not sufficiently similar to

18  Northwest's plans.  Dkt. 44.  Northwest counters that Defendants create "a hodgepodge

19  legal standard from outside the Ninth Circuit" and, by ignoring that standard and

20  applying the correct law, material questions of fact exists on the issue of substantial

21  similarity.  Dkt. 60

22

1   **A.      Summary Judgment Standard**

2           Summary judgment is proper only if the pleadings, the discovery and disclosure

3   materials on file, and any affidavits show that there is no genuine issue as to any material

4   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

5   The moving party is entitled to judgment as a matter of law when the nonmoving party

6   fails to make a sufficient showing on an essential element of a claim in the case on which

7   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

8   323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

9   could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

10  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

11  present specific, significant probative evidence, not simply "some metaphysical doubt").

12  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

13  if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

14  jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

15  U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

16  626, 630 (9th Cir. 1987).

17          The determination of the existence of a material fact is often a close question.  The

18  Court must consider the substantive evidentiary burden that the nonmoving party must

19  meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

20  U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

21  issues of controversy in favor of the nonmoving party only when the facts specifically

22  attested by that party contradict facts specifically attested by the moving party.  The

1    nonmoving party may not merely state that it will discredit the moving party's evidence

2    at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

3    *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

4    nonspecific statements in affidavits are not sufficient, and missing facts will not be

5    presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

6    **B.**    **Infringement**

7         To establish copyright infringement, a plaintiff must prove two elements: "(1)

8    ownership of a valid copyright, and (2) copying of constituent elements of the work that

9    are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The

10    parties do not contest the first element. With regard to the second element, "'[b]ecause

11    direct evidence of copying is not available in most cases,' a plaintiff can establish

12    copying by showing (1) that the defendant had access to the plaintiff's work and (2) that

13    the two works are substantially similar." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,

14    676 F.3d 841, 846 (9th Cir. 2012), *as amended on denial of reh'g and reh'g en banc*

15    (June 13, 2012) (quoting *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996)).

16         **1.**    **Access**

17         Taking the facts in the light most favorable to Northwest, the Court easily

18    concludes that more than sufficient evidence exists to show that BRC had a high level of

19    access to Northwest's plans. Not only were the parties engaged in a close business

20    relationship with an essentially open door policy, but BRC also hired a former Northwest

21    designer. Accordingly, the Court concludes that Northwest has submitted sufficient

22

1    evidence to meet the first element of the second element of its copyright infringement

2    claim.

3        **2.      Substantially Similar**

4        To determine whether two works are substantially similar, we apply a two-part

5    test. *Smith*, 84 F.3d at 1218. The "extrinsic test" is an "objective comparison of specific

6    expressive elements"; it focuses on the "articulable similarities" between the two works.

7    *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Sid & Marty*

8    *Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.

9    1977)). The "intrinsic test" is a subjective comparison that focuses on "'whether the

10    ordinary, reasonable audience' would find the works substantially similar in the 'total

11    concept and feel of the works.'" *Id*. (quoting *Kouf v. Walt Disney Pictures & Television*,

12    16 F.3d 1042, 1045 (9th Cir. 1994)). "At summary judgment, courts only apply the

13    extrinsic test; the intrinsic test, which examines an ordinary person's subjective

14    impressions of the similarities between two works, is exclusively the province of the

15    jury." *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir.

16    2006).

17        In *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994), the

18    Ninth Circuit applied the "well-settled principles" of copyright law using the following

19    three steps:

20            (1) The plaintiff must identify the source(s) of the alleged similarity
        between his work and the defendant's work.

21            (2) Using analytic dissection, and, if necessary, expert testimony, the
        court must determine whether any of the allegedly similar features are

22        protected by copyright. . . . [U]nprotectable ideas must be separated from

potentially protectable expression; to that expression, the court must then apply the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product.

(3) Having dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to "broad" or "thin" protection. Depending on the degree of protection, the court must set the appropriate standard for a subjective comparison of the works to determine whether, as a whole, they are sufficiently similar to support a finding of illicit copying.

*Id*. at 1443.

In this case, comparison of the plans in question constitutes a massive undertaking by the Court.  Defendants contend that Northwest's "First Amended Complaint contains more than 140 separate infringement allegations that one of [Northwest's] plans is infringed by [Defendants' plan]."  Dkt. 44 at 7; *see also* Dkt. 47-27 at 14–78 (sixty-five-page chart of 131 pairs of copyrighted plans and accused plans).  Although Northwest withdrew some claims, it appears that resolution of the instant motion requires the Court to implement the three-part substantial similarity test at least 131 times.  While the Court may ultimately need to analyze every valid claim of infringement, there are more efficient ways to handle the workload without violating either party's due process rights.  *See* Fed. R. Civ. P. 1 (the rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").  For example, in massive patent infringement cases, the Court has the inherent authority to initially limit and progressively resolve the asserted claims when "the number of claims is so large as to make the case inefficient and unmanageable."  *Oasis Research, LLC v. Adrive, LLC*, No. 4:10-CV-00435, 2011 WL

1  7272473, at *2 (E.D. Tex. Sept. 13, 2011) (citation omitted); *see also Eagle Harbor*

2  *Holdings, LLC v. Ford Motor Co*., No. C11-5503 BHS (W.D. Wash. February 11, 2013).

3  Implementing a similar, systematic approach in this case will result in more manageable,

4  specific, and efficient arguments and orders.  The parties shall meet and confer and

5  decide on the five to ten most relevant pairs of allegedly infringed plans.  Absent

6  agreement, each side may propose up to five designs for the Court's consideration.

7         Nonetheless, for the benefit of the parties and to resolve the numerous legal issues

8  involved, the Court will analyze one of Northwest's claims.  Without input from the

9  parties, the Court will analyze the alleged infringement that precipitated this action,

10  Northwest plan 2502 and BRC plan 2353.[1]

11              **a.    Alleged Similarities**

12         Northwest alleges that there are numerous similarities between Northwest plan

13  2502 and BRC plan 2353.  Northwest alleges similarities as follows:

14  **EXTERIOR:**
   - substantially similar footprints and similar massing of forms in the exterior
15     designs
   - identical garage door position and nearly identical garage door design
16   - identical front angled entry design element and porch position
   - gabling over garage
17   - similar siding on garage gables
   - similar porch roof over garage/front porch
18  **FIRST FLOOR**
   - overall form and composition of space
19   - similar room placement and traffic flow patterns

20

21  _____

22         [1] Northwest asserts this claim in the second amended complaint so the Court is not
   issuing an advisory opinion.  Dkt. 99.

- the front entry, entry closet, living room, dining room and garage are in the same relative locations and have similar proportions to the other spaces

**SECOND FLOOR**
- Overall form and composition of space
- Master closet in similar location

Dkt. 64 at 32.  Northwest's expert, Christopher Restak, opines as follows:

> Comparing Defendant Benjamin Ryan's BOA 2353 plan to the Northwest Home Designing's 2502 plan reveals significant similarities in the use of details and the combination of those details, and materials, into the finished product. Both floor plans are relatively narrow at the front and main entry area, which is located around the corner behind the front garage. Both entry porches consist of a low gabled roof, supported by matching posts at either side of the entry. The outline of the rear and left side elevations, with respect to the overall massing, is essentially identical. The 2502 and the companion 2501 share many of the same exterior details, including garage door fronts, fully shingled gables above the garage as well as exterior treatments, such as articulated exterior band boards and double doors at the exterior end of the building.

Dkt. 62, Declaration of Christopher Restak, Exh. A at 12.  Based on this information, the Court concludes that Northwest has sufficiently identified alleged similarities between the plans.

      **b.**    **Analytical Dissection**

The extrinsic test requires "analytical dissection of a work and expert testimony." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000).  "Analytical dissection requires breaking the works down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004) (internal quotation and citation omitted).  Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to

1  distinguish between the protected and unprotected material in a plaintiff's work.  *Apple*,

2  35 F.3d at 1443.

3        First, the Court will address the testimony offered by Northwest's expert.

4  Northwest contends that "the Ninth Circuit routinely finds that summary judgment is

5  inappropriate when the non-moving party's expert supports its position."  Dkt. 60 at 17

6  (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)).  In

7  *Southerland*, the court stated that, "[a]s a general rule, summary judgment is

8  inappropriate where an expert's testimony supports the nonmoving party's case."  *Id.* at

9  1144 (citing *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1116 (9th Cir.

10  1989)).  Copyright cases, however, are an exception to this general rule.  "In this court's

11  leading copyright infringement case, we held that, in assessing the similarity of two

12  works, expert testimony is appropriate in some respects and inappropriate in others."

13  *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1473 (9th Cir. 1992) (citing

14  *Krofft*, 562 F.2d at 1164).  When conducting an objective analysis of protected elements,

15  the Court concludes that Northwest's expert's opinion is entitled to little to no weight.

16  *Id.*  This seems to be especially true in cases involving architectural designs.  *See*, *e.g.*,

17  *Zalewski v. T.P. Builders, Inc.*, No. 1:10-CV-876 GLS/RFT, 2012 WL 590051, at *3

18  (N.D.N.Y. Feb. 22, 2012), *aff'd sub nom. Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d

19  95 (2d Cir. 2014).  Moreover, according to the *Apple* test, expert testimony is helpful in

20  dissecting the protected from unprotected elements, not the ultimate legal question of

21  whether the works are substantially similar.  *Apple*, 35 F.3d at 1443 ("Using analytic

22  dissection, and, if necessary, expert testimony, the court must determine whether any of

1    the allegedly similar features are protected by copyright.").  Thus, the Court declines to

2    conclude that Mr. Restak's opinions alone create questions of material fact on the issue of

3    substantial similarity.

4           Second, Northwest claims that there is no copyright "light" and that architectural

5    works have strong copyright protections.  Dkt. 60 at 31–33.  The Court agrees with

6    Northwest to the extent that the *Apple* "broad" versus "thin" degrees of protection

7    governs all copyrights.  In *Intervest Const., Inc. v. Canterbury Estate Homes, Inc.*, 554

8    F.3d 914 (11th Cir. 2008), the court separated copyrights into categories and concluded

9    that architectural designs are entitled only to "thin" protections.  *Id*.  The Court agrees

10   with the Second Circuit that *Intervest* is somewhat of an outlier.  *Zalewski*, 754 F.3d at

11   103–104.  Thus, the Court does not conclude that Northwest's designs are categorically

12   entitled only to "thin" protections.  Similarly, the Court agrees with Northwest that mass

13   produced designs are also not categorically entitled to lesser protection.  Dkt. 60 at 33.

14          Third, Northwest argues the Ninth Circuit protects expressions of common

15   elements.  Dkt. 60 at 33–36.  The Court agrees with Northwest because, in the Ninth

16   Circuit, "infringement can 'be based on original selection and arrangement of unprotected

17   elements.'" *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002) (quoting *Shaw v. Lindheim*,

18   919 F.2d 1353, 1446 (9th Cir. 1990)).

19          Fourth, Northwest argues that the doctrine of merger does not apply in this case.

20   Dkt. 60 at 36–37.  The doctrine of merger provides that "when an idea and its expression

21   are indistinguishable, or 'merged,' the expression will only be protected against nearly

22   identical copying."  *Apple*, 35 F.3d at 1444 (citing *Krofft*, 562 F.2d at 1167–68).  "For

1    example, in this case, the idea of an icon in a desktop metaphor representing a document

2    stored in a computer program can only be expressed in so many ways. An iconic image

3    shaped like a page is an obvious choice." *Id.*  In a subsequent case, the Ninth Circuit

4    stated that "[u]nder the merger doctrine, courts will not protect a copyrighted work from

5    infringement if the idea underlying the copyrighted work can be expressed in *only one*

6    *way*, lest there be a monopoly on the underlying idea." *Ets-Hokin v. Skyy Spirits, Inc.*,

7    225 F.3d 1068, 1082 (9th Cir. 2000) (emphasis added).  Northwest argues that the "one

8    way" language in *Ets-Hokin* limits the merger doctrine throughout the Ninth Circuit.  The

9    Court disagrees.  A later panel opinion, *Ets-Hokin*, may not contradict an earlier panel

10   opinion, *Apple*, and, even if it is not a direct contradiction, the Court is not persuaded that

11   the *Ets-Hokin* panel intended to place such a drastic limitation on the traditional merger

12   doctrine.

13         Furthermore, the great weight of authority suggests that merger is applicable to

14   architectural plans.  In *Zalewski*, the court stated that "[e]fficiency is an important

15   architectural concern" because it narrowed the practical range of options for construction.

16   754 F.3d at 105.  Specifically, "[a]ny design elements attributable to building codes,

17   topography, structures that already exist on the construction site, or engineering necessity

18   should therefore get no protection." *Id.*  Similarly, in *Howard v. Sterchi*, 974 F.2d 1272,

19   (11th Cir. 1992), the court held that "[t]he variety of ways a two-story rectangle can be

20   divided into three bedrooms, two baths, a kitchen, a great room or living room, closets,

21   porches, etc., is finite." *Id.* at 1276; *see also Axelrod & Cherveny Architects, P.C. v.*

22   *Winmar Homes*, No. 2:05 711 ENV ETB, 2007 WL 708798, at *13 (E.D.N.Y. Mar. 6,

1   2007) ("[T]here are only so many ways to arrange a two-story four-bedroom home.");

2   *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1297 (D.C. Cir. 2002) ("to hold

3   otherwise would render basic architectural elements unavailable to architects generally,

4   thus running afoul of the very purpose of the idea/expression distinction").  Therefore,

5   the Court concludes that the doctrine of merger applies to Northwest's infringement

6   claims.

7          Fifth, Northwest argues that the doctrine of *scènes-à-faire* does not apply in this

8   case.  Dkt. 60 at 37–38.  *Scènes-à-faire* holds that when similar features in the item

9   claimed to be copyrighted are "'as a practical matter indispensable, or at least standard, in

10  the treatment of a given [idea],' they are treated like ideas and are therefore not protected

11  by copyright."  *Apple*, 35 F.3d at 1144 (quoting *Frybarger v. Int'l Bus. Machs. Corp.*,

12  812 F.2d 525 (9th Cir. 1987)).  In *Zalewski*, the court held that this doctrine applied to

13  architectural plans stating:

14          Neoclassical government buildings, colonial houses, and modern high-rise
            office buildings are all recognized styles from which architects draw.
15          Elements taken from these styles should get no protection. Likewise, there
            are certain market expectations for homes or commercial buildings. Design
16          features used by all architects, because of consumer demand, also get no
            protection.

17  754 F.3d at 105.  The Court finds this logic persuasive and Northwest cites no binding

18  authority to the contrary.  Therefore, the Court concludes that the *scènes-à-faire* doctrine

19  applies to architectural drawings of house plans.

20         Applying these principles to the plans in question, the Court concludes that

21  Northwest plan 2502 has very few protectable elements.  Defendants have submitted

22

1    evidence that the majority of the claimed similarities are unprotectable.  Dkt. 46-2 at 31–

2    32.  For example, Defendants' expert, Larry Johnson, contends that "[t]he footprints are

3    similar only due to type of house addressing narrow deep lot and is related to the function

4    of the house, market demands, the type of house, and other designs by third parties use

5    similar forms and compositions."  *Id*. at 31.  Thus, Northwest's alleged similarity is

6    precluded by the merger doctrine because only so many designs may fit onto a narrow

7    deep lot.  Similarly, the alleged identical garage door position is a function of how

8    vehicles enter the lot, and, as an obvious corollary, the garage must be in the same

9    location on both plans.

10        On the other hand, Defendants fail to distinguish other alleged similarities such as

11   the entry porch roofs or the identical position of the entry ways.  These items may be

12   unprotected under the *scènes-à-faire* doctrine, but the Court is unable to locate any

13   evidence showing that these are elements of a popular design, such as a colonial house.

14   The alleged "overall form and composition of space" could be considered an expression

15   as opposed to an unprotectable idea.  Therefore, the Court concludes that Northwest has

16   shown few protectable similarities and a small range of expression exists.

17            c.      **"Broad" v. "Thin" Protection**

18        Based on the analytical dissection analysis, the Court concludes that Northwest's

19   plan is entitled to thin protection.  "As compilations consisting largely of uncopyrightable

20   elements, the organizers should be afforded only limited protection."  *Harper House, Inc.*

21   *v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989).  "Indispensable expression is

22   accorded only this slight protection because it is so close to the nonprotectible idea itself

1   that 'the expression provides nothing new or additional over the idea.'" *Frybarger*, 812

2   F.2d at 530 (quoting *Atari, Inc. v. North American Philips Consumer Elecs. Corp.*, 672

3   F.2d 607, 616 (7th Cir. 1982)).  Accordingly, the medium "may be protected only against

4   virtually identical copying." *Id.*

5        Northwest argues that, because BRC had a high degree of access to the plans at

6   issue, the virtually identical standard does not apply.  Dkt. 60 at 38.  "Under our case law,

7   substantial similarity is inextricably linked to the issue of access." *Three Boys Music*

8   *Corp.*, 212 F.3d at 485.  In what is known as the "inverse ratio rule," courts "require a

9   lower standard of proof of substantial similarity when a high degree of access is shown."

10  *Smith*, 84 F.3d at 1218.  Although the majority of courts reject this rule, it is binding law

11  in the Ninth Circuit.  *See* 3 *Patry on Copyright* § 9:91.

12       Defendants counter that the rule is not applicable to this case because "proof of

13  access is related to the issue of factual copying."  Dkt. 71 at 11.  The Court agrees to a

14  certain extent with the following explanation:  "No amount of proof of access will suffice

15  to show copying if there are no similarities . . . ." *Funky Films, Inc.*, 462 F.3d at 1081.

16  Going one step further, no amount of access or copying will suffice to show infringement

17  if there is no *wrongful* copying.  The difference between copying and wrongful copying

18  is as follows:

19        The second and third elements [of a copyright infringement claim]—
     copying and wrongful copying—are often confused. This confusion is
20   understandable; in many cases any copying of a work is wrongful, and thus
     there is often no need to draw the distinction. Nonetheless, the distinction
21   can be important. Not every portion or aspect of a copyrighted work is
     given copyright law's protection. Copying these aspects of a work is not
22   wrongful, and thus not all copying is wrongful.

An example is helpful. Suppose a particular law professor has never met any of my law clerks and has never read any of their numerous law review articles. If that professor independently composes a paragraph, which, by coincidence, is very similar to—or indeed identical with—a paragraph from one of their articles, the professor need not fear copyright liability. Even though the works are similar, the professor has not copied, and, therefore, element two of the infringement cause of action—actual copying—is not satisfied. Independent creation is a defense to copyright infringement.

Likewise, one of my clerk's articles may contain a lengthy quotation from a court opinion. The article is copyrighted, but the court opinion is in the public domain. A subsequent author may copy the language from the court opinion directly out of the article without infringing my clerk's copyright. This second author will have copied from my clerk, but not wrongfully. He took only what was in the public domain and therefore unprotected. In this example, element two—copying—is satisfied, but element three—wrongful copying—is not.

Confusion between elements two and three arises because a close similarity between two works is often relevant to proving both actual copying and wrongful copying. Obviously, if two paragraphs are identical, a reasonable inference is that the second paragraph was copied from the first. If the copied paragraph contains only protected material, then this similarity is also strong evidence that the copying was wrongful. Thus, in the first example above, the professor independently created a paragraph identical to my clerk's, but given the striking similarity between the paragraphs, we might be forgiven for thinking that the professor copied, and copied wrongfully.

When an original work contains many *un*protected elements, however, a close similarity between it and a copy may prove only copying, not wrongful copying. This is because the similarity may derive only from these unprotected elements. For clarity, the term "substantial similarity" is properly reserved for similarity that exists between the protected elements of a work and another work. If two works are "substantially similar," any copying was wrongful. By contrast, similarity that relates to unprotected elements is probative only of copying—not wrongful copying—and is referred to as "probative similarity."

*Zalewski*, 754 F.3d at 100–01.

In this case, Northwest has failed to show wrongful copying even with a high degree of access.  Taking the facts in the light most favorable to Northwest, the Court

1    concludes that Northwest has shown a high degree of access.  Thus, in the Ninth Circuit,

2    some lower standard of proof than "virtual copying" must be shown on the issue of

3    substantial similarity.  *Frybarger*, 812 F.2d at 530; *Three Boys Music*, 212 F.3d at 485.

4    The Court is unaware of, and the parties have failed to cite, any Ninth Circuit authority

5    addressing the proper standard of proof in the circumstances of a high degree of access to

6    a thinly protected work.  The Court concludes that the nonprotectable ideas outweigh the

7    indispensable expressions such that Northwest's plan is accorded only slight protection.

8    *Frybarger*, 812 F.2d at 530.  In other words, the alleged copying of unprotected material

9    outweighs the alleged wrongful copying of protected expressions.  Although the Second

10   Circuit has rejected the inverse ration rule, *Arc Music Corp. v. Lee*, 296 F.2d 186 (2d Cir.

11   1961), in *Zalewski*, the court concluded that, on facts very similar to this case, the

12   copyright holder had proved "at most copying, not wrongful copying." *Zalewski*, 754

13   F.3d at 106.

14        Although the Court has found that Northwest has shown some protectable

15   elements in its plan, those indispensable expressions do not outweigh the overwhelming

16   inclusion of nonprotectable elements.  Even if BRC had full access to Northwest's plan,

17   this evidence at most proves copying but not wrongful copying.  The slight similarities do

18   not pass the extrinsic test of objective similarities between the two works.  Therefore, the

19   Court grants Defendants' motion for summary judgment on Northwest's claim that BRC

20   plan 2353 infringes Northwest plan 2501.

21        The parties shall meet and confer and submit a joint status report on a potentially

22   more efficient means to resolve the remaining 130 comparisons.

1

**IV. ORDER**

2        Therefore, it is hereby **ORDERED** that Defendants' motion for summary

3   judgment (Dkt. 44) is **GRANTED in part** on Northwest's claim that BRC plan 2353

4   infringes Northwest plan 2501 and **DENIED in part without prejudice** on all other

5   claims.  The parties shall submit a joint status report as directed no later than October 14,

6   2016.

7        Dated this 26th day of September, 2016.

8

9   _____

10  BENJAMIN H. SETTLE
    United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22